UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
AIRCRAFT SERVICES RESALES LLC,

                        Plaintiff,

         -against-

OCEANIC CAPITAL COMPANY, LTD.,

                        Defendant.
-----------------------------------------------------------x

```
USDS SDNY
DOCUMENT
ELECTRO...
DOC #: _____
DATE FILED: 8/14/13
```

09 Civ. 8129 (PKC)

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

P. KEVIN CASTEL, District Judge:

      Plaintiff Aircraft Services Resales, LLC ("Aircraft Services") brings this breach of contract action against defendant Oceanic Capital Company, Ltd. ("Oceanic"). Aircraft Services, which engages in the business of selling, chartering, and managing private aircraft, entered into three materially identical purchase agreements for three used helicopters. Oceanic, the purchaser, ultimately closed on only one of the helicopters. For the two unfulfilled contracts (the "Contracts"), Aircraft Services seeks actual damages—the purchase price less the market value of the helicopters at the time of the breach. Oceanic asserts that section 2.2 of the Contracts limits Aircraft Services's damages to the $100,000 deposit per helicopter.

      The Contracts are materially identical. Section 2.2 of the Contracts, discussing the deposit for the helicopters, provides:

> As security for [Defendant-Purchaser's] obligations hereunder, [Plaintiff-Seller] hereby acknowledges and confirms that [Purchaser] has deposited with [an escrow agent] the amount of US $100,000.00 (the "Deposit"). The Deposit is non-refundable except as provided herein.
>
> [Purchaser] acknowledges that [Seller], by entering into this Agreement, is removing the Aircraft from the market in reliance upon [Purchaser's] agreement to purchase the Aircraft and that failure by [Purchaser] to purchase the Aircraft, where such failure would constitute a breach of this Agreement may result in the loss

1

> by [Seller] of the opportunity to otherwise market the Aircraft. [Purchaser] therefore agrees that the amount of the Deposit shall constitute liquidated damages arising from the failure by [Purchaser] to purchase the Aircraft, where such failure would constitute a breach of this Agreement and, to the fullest extent permitted by law, [Purchaser] (and all persons claiming through [Purchaser]) waives its right to claim that any part of the Deposit should be returned by [Seller], regardless of the price at which the Aircraft may be sold by [Seller] after termination of this Agreement in circumstances where [Purchaser] has breached this agreement.

(PX 40, 41.) At a bench trial, the Court heard testimony from President and CEO of Aircraft Services George Allen Reenstra; COO of Aircraft Services Jonathan Parker; and Edward W. Eckhardt, an expert in the area of valuing helicopters. Oceanic did not call any witnesses though it offered documents into evidence.

On August 16, 2010, the Court concluded that section 2.2 of the Contracts was unambiguous and called for liquidated damages in the amount of $100,000 per contract in the event of Oceanic's breach. Aircraft Servs. Resales Inc. v. Oceanic Capital Co., Ltd., 09 Civ. 8129 (PKC), at 16 (S.D.N.Y. Aug. 16, 2010) ("Aircraft I"). The Court also concluded that the liquidated damages provision was reasonable and therefore enforceable. Id. at 19. The Court rejected Aircraft Services's argument that the $100,000 identified as liquidated damages in the contract was not plaintiff's sole remedy. Id. at 20. Aircraft Services appealed from the Court's final judgment.

The Court of Appeals vacated the judgment, concluding that section 2.2 was ambiguous because it "focused on the obligations and concessions of Purchaser," Aircraft Servs. Resales LLC v. Oceanic Capital Co., Ltd., 493 Fed. App'x 173, 175 (2d Cir. 2012) ("Aircraft II"), an argument not pressed by Aircraft Services on appeal. The Court of Appeals stated:

> the words of the section, taken literally, address only what *Purchaser* will concede in the event of its breach and do not

2

> expressly address the question whether Seller agrees to liquidated damages of $100,000 in that circumstance. The section does not explicitly purport to restrict the remedies available to Seller if Purchaser breaches.

Id. Accordingly, section 2.2 may be "intended to mean only what it said and not to imply parallel agreement of Seller to what Purchaser explicitly agreed to." Id. at 176. The Court of Appeals remanded the case to this Court with instructions to consider appropriate extrinsic evidence. Id.

Oceanic admits that it breached the Contracts by failing to close on the purchase of the two helicopters. The only issue that remains is Oceanic's affirmative defense that section 2.2 in the Contracts limits Aircraft Services's damages to $100,000 per contract. At a conference following the remand, the parties agreed that the trial record is closed, and need not be reopened because neither party was foreclosed from offering extrinsic evidence or excluded from cross-examination on such extrinsic evidence at the trial. (Docket No. 39.) Taking the trial record as a whole and for the reasons discussed, the Court concludes the parties did not intend to imply Aircraft Services's parallel agreement to what Oceanic expressly agreed to in section 2.2. Accordingly, Aircraft Services may recover its actual damages from the breach.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.  The Court incorporates by reference factual findings 1 through 64 in its August 16, 2010 Memorandum and Order.[1]

2.  The Contracts are governed by New York law. (PX 40 § 5.6(a); PX 41 § 5.6(a).)

---

[1] To the extent a Finding of Fact reflects a legal conclusion, it shall be deemed a Conclusion of Law, and vice versa. Citations to the record are not intended to imply that the cited portion of the record is the only support for the Court's finding.

3

3. There is no dispute that the Contracts were valid and binding. Rather, Oceanic asserts Aircraft Services's claim for damages is limited to $100,000 by section 2.2 of the Contracts.

4. A defendant bears the burden of proving an affirmative defense at trial. Fed. Deposit Ins. Co. v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994). Thus, Oceanic has the burden of proving that the parties intended to imply that Aircraft Services agreed to what Oceanic explicitly agreed to—that the amount of the deposits equals liquidated damages. Aircraft II, 493 Fed. App'x at 176.

5. The Court of Appeals has concluded that section 2.2 is ambiguous.

6. "[W]here the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered." JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009). "Where there is such extrinsic evidence, the meaning of the ambiguous contract is a question of fact for the factfinder." Id. If there is no extrinsic evidence as to the agreement's meaning, the meaning of an ambiguous contract is to be decided by the Court. Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 66 (2d Cir. 2000).

7. Extrinsic evidence includes "the acts and circumstances surrounding execution of the ambiguous term" of the contract. Roberts v. Consol. Rail Corp., 893 F.2d 21, 24 (2d Cir. 1989). "The parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent." Ocean Transport Line, Inc. v. Am. Philippine Fiber Indus., Inc.,

4

743 F.2d 85, 91 (2d Cir.1984). "[A] unilateral expression of one party's postcontractual subjective understanding of the terms of the agreement . . . [is] not probative as an aid to the interpretation of the contract." Invista B.V. v. E.I. Du Pont De Nemours & Co., No. 07 Civ. 713 (WHP), 2008 WL 4865044, at *4 (S.D.N.Y. Nov. 5, 2008) (alterations in original) (quoting Murray Walter, Inc. v. Sarkisian Bros., Inc., 183 A.D.2d 140, 146 (3d Dep't 1992)).

8. The parties offer little extrinsic evidence that speaks to the meaning of section 2.2. But that which is offered supports the conclusion that the parties did not intend to limit Aircraft Services's damages to the deposits.

9. While the deposit provision was discussed by the parties, they did not refer to the $100,000 deposits as liquidated damages during negotiations.

10. Moreover, the parties' conduct after it became evident the deal would not close as planned indicates Aircraft Services's damages were not limited to the $100,000 deposits. The original closing date for the two helicopters at issue in this action was August 8, 2008. (PX 40, 41.) The closing date for the third helicopter was originally July 31, 2008, but was subsequently extended to August 8, 2008 as well. (Parker Decl. ¶ 31.) On July 31, 2008, in exchange for extending the closing date on all three helicopters, Oceanic authorized the escrow agent to release the $100,000 deposits to Aircraft Services. (Id. ¶ 32; Docket No. 42 at 8; Docket No. 45 at 8.) Aircraft Services continued to keep the helicopters off the market.

11. Oceanic essentially argues that the release of the $100,000 deposits constituted consideration for the extension *and* a payout of liquidated damages. Were recovery of the deposited funds plaintiff's exclusive remedy, the July 31, 2008 release of the funds left Aircraft Services without recourse in the event of a later breach. Rather, the parties' conduct more logically reflects an understanding that, in the event of a breach, Aircraft Services's damages were not limited to the amount of the deposits.

12. Oceanic maintains the funds were released when it defaulted, and Aircraft Services's failure to reserve its right to seek actual damages reflects that Aircraft Services understood its remedy was limited to the deposits. But the deposits were released approximately one week before a breach could occur on August 8, 2008—the original closing date for the two aircraft. There was no need for Aircraft Services to reserve its right to later seek actual damages.

13. Moreover, in April of 2009, months after the original closing date had passed, Oceanic's Chief Operating Officer Oto Hughes, who signed the Contracts on behalf of Oceanic, stated in an internal e-mail: "We are contractually obligated to put up the money and take delivery of these helicopters. If [Aircraft Services] wanted to, they could ask for liquidated damages which could in effect be the gap between what we committed to pay versus what can be obtained for these helicopters in the market today plus financing and storage costs." (PX 120.)

14. Though Hughes erroneously associates the term "liquidated damages" with the concept of actual damages, it is plain Oceanic anticipated liability in the amount of actual

6

damages should the deal fail to close.  Oceanic offers no evidence that a recipient of the e-mail corrected Hughes's understanding of the contractual provisions.

15.     The Court of Appeals noted that the e-mail "may . . . constitute extrinsic evidence of how Purchaser understood (or misunderstood) Section 2.2 and may therefore be probative of Purchaser's intent." Aircraft II, 493 Fed. App'x at 176 n.4.  Even though the e-mail was sent almost a year after the Contracts were executed, it may be considered as an admission made by a party-opponent.  A party's post-execution interpretation of a contract before a motive arose (*ante litem motam*) has some probative value, especially here when the party later contradicts itself in litigation.  See Ocean Transport Line, 743 F.2d at 91.

16.     Oceanic offers no extrinsic evidence of its own.  Rather, it asserts that where there is no extrinsic evidence of the parties' intent, the Court must interpret section 2.2 against the drafter and in a manner consistent with the contract as a whole.

17.     New York law provides that ambiguities in a contract must be construed against the drafter. Cf. McCostis v. Home Ins. Co. of Indiana, 31 F.3d 110, 113 (2d Cir. 1994) ("If the extrinsic evidence does not yield a conclusive answer as to the parties' intent, it is appropriate for a court to resort to other rules of construction, including the contra-insurer rule, which states that any ambiguity in an insurance policy should be resolved in favor of the insured."). Here, however, the parties negotiated revisions to Aircraft Services's form contract to reach the Contracts' final forms. Oceanic had retained White & Case LLP, a large law firm, which

reviewed the Contracts and suggested changes. Though Oceanic did not make changes to the contractual language at issue, the Court concludes it had meaningful opportunities to negotiate the contractual terms. Therefore, the general principle that a contract should be construed against its drafter is not controlling. See Mercury Partners, LLC v. Pac. Med. Bldgs., L.P., No. 02 Civ. 6005, 2007 WL 2197830, at *9 (S.D.N.Y. July 31, 2007) (Pitman, M.J.); Shadlich v. Rongrant Assocs., LLC, 66 A.D.3d 759, 760 (2d Dep't 2009) ("[T]he rule that ambiguous language in a contract will be construed against the drafter is not applicable, because the subject lease resulted from negotiations between commercially sophisticated entities."); Coliseum Towers Assocs. v. County of Nassau, 2 A.D.3d 562, 565 (2d Dep't 2003) ("The contra proferentem doctrine was inapplicable to the subject lease since the record demonstrates that CTA participated in negotiating its terms.").

18.    Oceanic also maintains its interpretation of section 2.2 is the only interpretation consistent with the contract as a whole. See Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992) (where neither side introduced parol evidence the court must choose the interpretation of the ambiguous clause "which best accords with the sense of the remainder of the contract" (citation omitted)). It asserts the Recitals of the Contracts, which state "SELLER and BUYER (hereinafter referred to collectively as the 'Parties') hereby agree as follows:" clarifies that section 2.2 was agreed to by *both* parties. (PX 40, 41.)

8

19.     The Court notes that the Court of Appeals considered all provisions of the Contracts at issue, including the Recitals, before determining that section 2.2 was ambiguous.

20.     Oceanic asserts that the interpretation urged by Aircraft Services renders the Recitals language meaningless, a result disfavored by the Second Circuit as well as general principles of contract interpretation. However, Oceanic's interpretation renders the "[Purchaser] therefore agrees" language in section 2.2 mere surplusage. Under Oceanic's interpretation of the contract, those words in section 2.2 have no operative effect. It is not plain that one interpretation best achieves the objective of giving full meaning and effect to all contractual provisions. Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1019 (2d Cir. 1985) ("[A]n interpretation that gives a reasonable and effective meaning to all the terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect.").

21.     Accordingly, the arguments advanced by Oceanic are insufficient to surmount other evidence. The Court concludes that Oceanic has not met its burden of proving that section 2.2 limits Aircraft Services's damages to the amount of the deposits.

22.     The Court afforded little or no probative weight to the remaining arguments advanced by Aircraft Services.

23.     While Aircraft Services correctly asserts there is no evidence that the parties attempted to estimate the amount of actual damages in the event of a breach, the record reflects

that the parties anticipated the value of helicopters would remain constant or increase between the date of execution and the dates of closing.

24. That Parker and Renstra testified that Aircraft Services never intended section 2.2 to be a liquidated damages clause is of negligible import. These subjective, after-the-fact interpretations of the contract are not probative of the parties' intent. Invista, 2008 WL 4865044 at *4.

25. Aircraft Services maintains a valid liquidated damages clause states it is the "sole remedy" available in event of a breach, citing N.Y. U.C.C. § 2-719(1)(b) ("resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy"). While such language may be typical of liquidated damage provisions, Aircraft Services points to no authority requiring a liquidated damages clause to contain such specific wording.

26. The Court adheres to the conclusion in its prior opinion that a separate draft agreement concerning the purchase of a new helicopter, which contained a liquidated damages clause including the "reasonable estimate" and "sole remedy" language, "was unexecuted and was for a different type of transaction" in which the seller entered into a purchase agreement with the manufacturer. Aircraft I at 16. The Court also adheres to its conclusion that this was not course of dealing evidence. Id. at 15.

27.     Under New York law, a seller's damages upon a buyer's breach are equal to the purchase price less the market value of the goods on the date of the breach. See N.Y. U.C.C. § 2-708(1). The parties dispute when the breach occurred.

28.     Oceanic asserts the date of the breach is August 8, 2008, the date on which the deals were set to close. Evidence at trial established that on August 8, 2008 the market value of the helicopters had remained constant or increased from the purchase price. Were Oceanic correct, it would be liable for no damages.

29.     Aircraft Services asserts the applicable date is July 2009, the date on which it became evident the deals would not close. According to Aircraft Services's expert Edward W. Eckhart, by July 2009 the values of the helicopters had decreased significantly to $9.3 million total.

30.     The Contracts contain a clause stating contractual provisions cannot be modified except through a signed writing by both parties. (PX 40 § 5.4; PX 41 § 5.4.) The parties agree that no writing was executed to modify the closing date of the Contracts other than an amendment extending the closing date for the third helicopter (not at issue in this suit) to August 8, 2008.

31.     Yet, on numerous occasions Oceanic provided Aircraft Services with additional funds in order to extend the date of closing. Aircraft Services kept the two helicopters off the market until August 2009.

11

32.     Under New York General Obligations Law, written agreements that prohibit oral modification cannot be changed by an oral agreement. (N.Y. G.O.L. § 15-301(1)). However, "[p]artial performance of an oral agreement to modify a written contract, if unequivocally referable to the modification, avoids the statutory requirement of a writing." Rose v. Spa Realty Assocs., 42 N.Y.2d 338, 341 (1977). "Moreover, when a party's conduct induces another's significant and substantial reliance on the agreement to modify, albeit oral, that party may be estopped from disputing the modification notwithstanding the statute." Id. Here, the parties conduct, i.e. Oceanic's payments and Aircraft Services's keeping the helicopters off the market, establish enforceable oral modifications.

33.     The last extension anticipated a closing date of no later than July 2009. Accordingly, the date of the breach is no later than July 2009.

34.     Aircraft Services's expert testified that the value of the two helicopters totaled $9.3 million in July 2009. The Court, in its prior opinion, concluded Eckhart qualified as an expert witness in the area of valuing used helicopters. Aircraft I at 13 (citing Fed. R. Evid. 702). Oceanic offered no competing expert testimony at trial. Accordingly, the Court concludes the value of the two helicopters as of July 2009 was $9.3 million.

35.     The total purchase price under the Contracts is $17,066,666. Oceanic has paid $852,500, leaving a total balance due of $16,214,166. Aircraft Services's damages equal the

total balance ($16,214,166) less the market value of the helicopters in July 2009 ($9.3 million), which is $6,914,166.

## CONCLUSION

For the reasons stated herein, the Court concludes that Aircraft Services is entitled to recover $6,914,166 in actual damages from Oceanic plus prejudgment interest from the date of breach at the simple rate of 9% per annum. Aircraft Services shall submit a proposed judgment within seven (7) days.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
       August 14, 2013